# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHILADELPHIA REGIONAL PORT : 
AUTHORITY, : 
: CIVIL ACTION
Plaintiff, : 
v. : 
: 
APPROXIMATELY 1.22 ACRES OF LAND : 
(IDENTIFIED AS SAVAGE YARD) IN : 
PHILADELPHIA, PENNSYLVANIA : NO.  04-5930
and CONSOLIDATED RAIL CORPORATION : 
and CBS OUTDOOR GROUP, INC. and CBS : 
OUTDOOR, INC. : 
: 
Defendants. : 
_____ : 
: 
PHILADELPHIA REGIONAL PORT : 
AUTHORITY and CONSOLIDATED RAIL : 
CORPORATION, : 
: 
Plaintiffs, : 
: 
v. : 
: 
: 
CBS OUTDOOR GROUP, INC. and CBS : 
OUTDOOR, INC., : 
: 
Defendants. : 

## MEMORANDUM

BUCKWALTER, S. J.                                             April 9, 2008

Currently pending before the Court are a Motion for Summary Judgment filed by

Plaintiff Philadelphia Regional Port Authority ("PRPA") and joined by Plaintiff Consolidated

Rail Corporation ("Conrail"), and a Cross-motion for Summary Judgment filed by Defendants

CBS Outdoor Group, Inc. and CBS Outdoor, Inc. (collectively "CBS").  For the reasons which

follow, the Court will grant PRPA and Conrail's Motion for Summary Judgment in its entirety and deny CBS's Motion for Summary Judgment in its entirety.

## I. FACTUAL HISTORY

The focus of the parties' dispute concerns a parcel of property constituting approximately 12.22 acres, otherwise known as the "Savage Yard," adjacent to the Walt Whitman Bridge in Philadelphia, Pennsylvania.  (PRPA Memorandum in Support of Motion for Summary Judgment, Ex. A.)  The property contains the supporting structures of two billboards, each of which has a single sign face (the "Savage Yard Billboards").  (Id. Ex. B at ¶ 8.)  In addition, three other billboards, each containing two sign faces, overhang a strip of the Savage Yard, but the supporting structures are not on the Savage Yard property (the "Overhang Billboards").  Collectively, the Savage Yard Billboards and the Overhang Billboards are known as the "Five Billboards."  (Id.)

### A.    The Master Site License and New Site Management Agreement

Conrail and CBS's predecessor, Transportation Displays Incorporated ("TDI"), entered into a Master Site License and New Site Management Agreement (the "MLA"), on January 1, 2001.  (Id. Ex. F.)  The MLA conferred a master license to CBS, on all property owned by Conrail as of that date, for the erection of billboard and bridge sign advertising.  (Id. Arts. II, III.)  By its terms, it divides the Conrail property into two types of sites:  (1) "Existing Sites," which are sites occupied by an Existing Sign and/or its structural support, or subject to an Existing License and (2) "New Sites," which are locations anywhere on Conrail property not covered by an Existing or Subsequent License.  (Id.)  In addition, the MLA provides for three types of licenses:  (1) "Existing Licenses," which are licenses issued by CBS prior to January 1,

2

2003, to construct, erect, maintain and use for advertising purposes, an Existing Sign on an

Existing Site on Conrail property; (2) "New Licenses," which are licenses issued by CBS to

construct, erect, maintain and use, for advertising purposes, a New Sign on a New Site after

January 1, 2003; and (3) "Subsequent Licenses," which are licenses that are not "New Licenses"

issued by CBS to construct, erect, maintain and use, for advertising purposes, on an existing site

upon the termination or expiration of an existing license.  (Id. §§ 1.09, 1.16, 1.22 .)   As agreed

by the parties, the Five Billboards at issue are characterized as "Existing Licenses" on "Existing

Sites."

        Section 2.01 of the MLA sets forth CBS's rights with respect to Existing Sites as

follows:

> CONRAIL hereby appoints [CBS] as Exclusive Managing Agent
> for the Existing Licenses and grants unto [CBS] an exclusive
> license to use the Existing Sites for Billboard and Bridge Sign
> advertising purposes only, pursuant to the terms, covenants,
> provisions, conditions and stipulations set forth herein.

(Id. § 2.01).  As to New Sites, section 3.01 of the Agreement states:

> CONRAIL hereby grants [CBS] for the Term of this Agreement
> the exclusive right to license New Sites for New Signs for
> advertising purposes only, subject to the terms, covenants,
> provisions, conditions and stipulations set forth herein.

(Id. § 3.01).  In consideration for the licenses granted to CBS for both the Existing Sites and the

New Sites, CBS paid Conrail sums of thirty-five million dollars and fifteen million dollars

respectively.  (Id. § 2.04(a).)

        The exclusive rights created under Section 2.01 and Section 3.01, however, are

explicitly limited in several respects.  First, section 12.02 states that "CONRAIL reserves the

right for any or no reason to require the removal of any Sign, subject to sections 2.05, 2.06 and 7.02 of this Agreement." (Id. § 12.02.) Moreover, section 17.01 makes the Agreement subject to any abandonment by Conrail of its railroad lines, all sales of Conrail property and all existing or future encumbrances or impairments in title to Conrail property. (Id. § 17.01.) Section 2.05 then sets forth the precise remedies available to CBS in the event that (1) Conrail sells or otherwise disposes of any property subject to a new, existing or subsequent license; (2) Conrail requires the removal of an existing, new or subsequent sign pursuant to § 12.02, or (3) the removal of an existing, subsequent or new sign is required because a court issues a final, non-appealable order that Conrail did not have sufficient rights to grant the license to CBS. (Id. § 2.05.) Section 2.06 goes on to modify the operation of this remedies provision:

> Notwithstanding Section 2.05, in no event shall [CBS] be entitled to the remedies set forth in Section 2.05 in the event that the sale, transfer, swap, abandonment or disposal of any Conrail Property by CONRAIL is made subject to the applicable License, and the acquirer of any such Conrail Property agrees to be bound by the terms of this Agreement with respect to the applicable License.

(Id. § 2.06.) Finally, section 7.02 indicates that, in the event any government requirements render impossible or impractical the erection of subsequent signs or new signs, or the continuation of existing signs, the MLA shall become null and void and CBS shall have to remove its signs and any compensation received from the government shall be shared in set percentages between Conrail and CBS. (Id. § 7.02.)

>    **B.**    **The Condemnation Proceedings and the Quitclaim Deed**

In November of 2004, Conrail was the record owner of the Savage Yard, having previously used it as a railroad yard. (Id. Ex. A, Ex. D ¶ 10, Ex. E ¶ 10.) On November 22,

2004, however, PRPA[1] filed a Notice of Filing of Declaration of Taking, Notice of

Condemnation, Declaration of Taking and Bond with respect to the Savage Yard, in a case styled

In a Condemnation Proceeding In Rem By The Philadelphia Regional Port Authority For the

Redevelopment Of Savage Yard Of Philadelphia Including Certain Land Improvements And

Property, at Court Term November 2004, No. 2962 ("Declaration of Taking"). (Id. Ex. B ¶ 9.)

The case was initiated in the Court of Common Pleas of Philadelphia County, but Conrail

subsequently removed it to federal court.[2]  (CBS Mem. Supp. Response and Cross, Ex. 1.)  On

February 4, 2005, CBS filed a Motion to Intervene in this action, which was granted.  (Id. Ex. 2.)

The condemnation never occurred.  (PRPA Mot. Summ. J., Ex. B, ¶ 10.)  Instead,

Conrail executed a Quitclaim Deed in Lieu of Condemnation ("Quitclaim Deed"), dated June 21,

2007, transferring the Savage Yard to PRPA.  (Id. Ex. C.)  The Quitclaim Deed, which was

recorded on August 1, 2007, reserved to Conrail "permanent, perpetual, exclusive and assignable

easements and rights" to the Five Billboards.  (Id. Ex. C at 3.)  To date, no relinquishment of the

condemnation or revesting of title in Conrail has been filed in this Court or with the Recorder of

Deeds.  (CBS Mem. Supp. Response and Cross, Ex. 12.)  Conrail and PRPA have agreed,

however, by way of Stipulated Order dated July 31, 2007, that the condemnation filings shall be

withdrawn and title to the subject property shall be revested in Conrail.  (Id. Ex. 11.)

---

1.   The Philadelphia Regional Port Authority is a corporate and political body created as a public authority and instrumentality of the Commonwealth.  55 P.S. § 697.1, et seq.

2.   This case was originally removed by Conrail to federal court based on Conrail's contention that the Surface Transportation Board ("STB") had exclusive jurisdiction over the matter.  (CBS Memorandum in Support of Its Response to PRPA's Motion and Cross-Motion for Summary Judgment, Ex. 1.)

C.      **The Remaining Legal Action**

The sole remaining portion of this case involves CBS's efforts to assert its rights, against both PRPA and Conrail, as master licensee for the placement of billboards at the Savage Yard.  Specifically, CBS claims that the easement in the Quitclaim Deed modifies and constricts its rights to the Five Billboards and omits its rights to place future signs on the Savage Yard. Further, it contends that it is a condemnee subject to a taking and is therefore entitled to just compensation and attorneys' fees and costs.  All parties have filed motions for summary judgment.

## II.  STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle do a judgment as a matter of law."  FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For a "genuine" issue of material fact to exist, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  When there are cross-motions for summary judgment, "[t]he court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion."  Kapp v. Norfolk Southern Ry. Co., 350 F. Supp. 2d 597, 606 (M.D. Pa. 2004) (citing FED. R. CIV. P. 56)).

Once the movant has carried its initial burden of proving an absence of a genuine issue of material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).  On cross-motions for summary judgment, where the parties generally dispute not the factual evidence, but only the legal ramifications thereof, such motions may be resolved in a single decision.  Kapp, 350 F. Supp. 2d at 606.

The parties in this case generally agree on the material facts underlying this case, as outlined above.  Accordingly, the Court proceeds to review only the disputed legal issues.

## III.  DISCUSSION

### A.    Whether MLA is an Easement by Estoppel or License Revocable at Conrail's Will

As noted above, CBS challenges the current sale of the Savage Yard to PRPA by Quitclaim Deed and contends that it maintains rights on the property for which it is entitled to compensation.  More specifically, CBS suggests that the MLA, by its operation, creates an easement by estoppel in CBS's favor that could not be revoked at Conrail's will and that ran with the sale of the Savage Yard.  Both PRPA and Conrail, in contrast, aver that any rights of recovery by CBS are precluded by the express language of the MLA, which is nothing more than a negotiated contractual license agreement.  In light of such arguments, this Court's analysis of the dispute at issue must begin with a precise definition of the nature of CBS's rights as created by the MLA.

Under Pennsylvania law, a license is a personal and initially revocable privilege to perform an act or series of acts on the land of another.  Hennebont v. Kroger Co., 289 A.2d 229, 231 (Pa. Super. Ct. 1972).  "While a license may be created by a written instrument, it is usually created orally, . . . and it conveys no interest or estate in land."  Kovach v. Gen. Tel. Co. of Pennsylvania, 489 A.2d 883, 885 (Pa. Super. Ct. 1985).

On the other hand, an easement by estoppel – traditionally referred to as an irrevocable license in Pennsylvania – will arise when a landowner permits a use of property under circumstances suggesting that the permission will not be revoked, and the user changes his or her position in reasonable reliance on that permission.  Morning Call, Inc. v. Bell Atlantic-Pennsylvania, 761 A.2d 139, 144 (Pa. Super. Ct. 2000) (citing Huff v. McCauley, 53 Pa. 206,

208 (1866)); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 2.10 (2000); see also

Pennsylvania Game Comm'n v. Bowman, 474 A.2d 383, 384 (Pa. Commw. Ct. 1984) ("A

license to use another's land will become irrevocable where the licensee, in reliance upon it,

treats his land in a way he would not have treated it except for the license, that is, by spending

money for such changes as would prevent his being restored to his original position." (citing

Bieber v. Zellner, 220 A.2d 17 (Pa. 1966)).  An owner who allows a use of the land to continue

"under circumstances in which it is reasonable to foresee that the [user] will substantially change

position" is thereafter estopped from denying the existence of an easement in favor of the user.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) at § 2.10(1).  Thus, the easement by estoppel

or irrevocable license gives "absolute rights, and protects the licensee in the enjoyment of those

rights."  Morning Call, Inc., 761 A.2d at 144 (quoting Cole v. Ellwood, 65 A. 678, 680 (Pa.

1907)).  Moreover, "successors-in-title take subject to an irrevocable license if they had notice of

the license before the purchase."  Id. (internal quotations omitted).

   In Pennsylvania, the elements of an estoppel are:  (1) misleading words, conduct,

or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of

reasonable reliance upon the misrepresentation by the party asserting the estoppel; and (3) the

lack of a duty to inquire on the party asserting the estoppel.  Louis W. Epstein Family P'ship v.

Kmart Corp., 13 F.3d 762, 774 (3d Cir. 1994).  In other words, "the key to an easement by

estoppel is inducement coupled with justifiable reliance on that inducement."  Id.  "The

permission need not be express, but may be inferred through the owner's acquiescence in an open

and obvious use of the land."  Kapp v. Norfolk Southern Ry. Co., 350 F. Supp. 2d 597, 612

(M.D. Pa. 2004).  Silence, however, is not an actionable misrepresentation where no duty to

9

disclose exists.  Id.  "Moreover, a lessor's silence would not give rise to an estoppel where the tenant's activities are entirely consistent with a temporary, permissive use."  Id.

CBS contends that the MLA at issue in this case, although initially a revocable license, ultimately became an easement by estoppel, which ran with the sale of the Savage Yard and bound PRPA's ownership interest.  In support of its position, CBS contends that the following undisputed facts lead to the legal finding of an easement:  (1) the MLA is a written contract between Conrail and CBS that covers the Savage Yard; (2) the MLA makes express "grants" to CBS of the rights to license existing and future signs in sections 2.01 and 3.01; (3) the PRPA was on notice of and had a complete copy of the MLA prior to its purchase of the Savage Yard; (4) CBS paid Conrail $50 million in 2001 for the "exclusive" license rights conveyed under the MLA; (5) CBS and its sublicensees spent additional money to erect and/or maintain the five existing signs on the Savage Yard; (6) the MLA, by its express terms, is not revocable at will; and (7) the agreement is not personal only to CBS, but runs to CBS's assignees.  (CBS Mem. Supp. Response and Cross, at 15.)

Notwithstanding CBS's seemingly well-crafted argument, the Court recognizes it as a red herring.  The parties do not dispute that the MLA created license rights on behalf of CBS to use Conrail's property for construction and maintenance of billboards.  Nothing in the arguments offered by CBS, however, suggests that the license was converted into an easement by estoppel.  As noted above, easements by estoppel are based on principles of equity, which recognize that a license given orally may become irrevocable by operation of detrimental reliance.  Kovach v. Gen. Tel. of Pennsylvania, 489 A.2d 883, 885 (Pa. Super. Ct. 1985).  Equitable relief, however, will lie only where there is no adequate remedy at law.  Maritrans GP

10

v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1286 (Pa. 1992).  Thus, where a binding contract

fully governs the rights of the parties, resort to the laws of equity is unnecessary.  See Robinson

v. Abington Ed. Ass'n, 423 A.2d 1014, 1016 (Pa. 1980) ("It is axiomatic that in order for a court

to grant equitable relief to redress the violation of a legal right, the remedy available at law must

be inadequate.").

        To that end, the Court is guided by the Pennsylvania Supreme Court's

proclamation in Margolin v. Pennsylvania R.R. Co., 168 A.2d 320 (Pa. 1961).  In that case, the

Pennsylvania Railroad Company had previously entered into a contractual agreement with the

Commercial Trust Company.  The agreement called for the erection and maintenance of a

footbridge by the Railroad Company from the train floor of the Broad Street Station to the

second-story level of the proposed, but as yet unconstructed, Commercial Trust Building.  Id. at

321.  So as to allow for the abutment of the footbridge at its northern side, the Commercial Trust

Building had to be specially designed and constructed.  Id. at 322.  When completed, the

footbridge crossed Market Street and was used for fifty years by patrons of the railroad, tenants

of the Trust Company and its successors in title and by the general public.  Id. at 321.  As use of

the Broad Street Station declined over time, the station closed and, subsequently, both the station

and footbridge were destroyed.  Id.  Due to the special conformance of the Commercial Trust

Company building, necessitated to comply with the contractual provisions of the original

agreement of 1901, the successors in title to the Commercial Trust Company claimed that an

implied license in the footbridge became irrevocable.  Id. at 322.  They asserted various damages,

including special costs incident to the erection of the building, modifications required on the

building following the removal of the footbridge, rental losses and depreciation in market value of the building.  Id.

> The Pennsylvania Supreme Court rejected this argument.  In doing so, it reasoned:

> [T]hese parties, or their predecessors in title, stipulated and defined their rights and obligations in a writing of their own making. The rights acquired are defined in the contract. . . . It just cannot be ignored and treated as nonexistent. By its terms the parties involved are bound. The contract itself is completely inconsistent with the existence of an irrevocable license by prescription and no matter how you evaluate this situation, any existing rights must basically and fundamentally be derived therefrom.

Margolin, 168 A.2d at 322 (internal citation omitted).

> Likewise, in the case at bar, contract law, not property principles, guide the Court's resolution of this dispute.  CBS's rights with respect to the Five Billboards at the Savage Yard, as well as on all existing Conrail property, were created by the MLA – a document that precludes the possibility of an easement by estoppel here.  The MLA precisely defines the parties' rights and obligations with regard to that license, and sets forth the exact remedies to which CBS would be entitled in the event that it was required to remove a billboard or if Conrail sold any of its property.  Resort to equitable relief is, therefore, unnecessary and, indeed, improper.  Any rights or entitlements of CBS must be derived from the MLA itself.[3]

> The Court finds CBS's contrary arguments unpersuasive.  First, CBS argues that the MLA's use of the word "grant" in conveying to CBS "an exclusive license to use the Existing Sites" and "exclusive rights to license New Sites," (PRPA Mem. Supp. Mot. S.J., Ex. F §§ 2.01,

---

3.   CBS's efforts to analogize Kapp v. Norfolk & Southern Railway Co., 350 F. Supp. 2d 597, 612 (M.D. Pa. 2004), and The Morning Call, Inc. v. Bell Atlantic-Pennsylvania, Inc., 761 A.2d 139, 144 (Pa. Super. Ct. 2000), are misplaced.  Neither of these cases involved a written contract which created the license and expressly set forth the parties' rights and obligations in relation to that license.

3.01), suggests that the MLA was intended to create an easement rather than a license.  In support

of this argument, CBS cites to a New York case which held that language including the words

"grant" and "convey" indicates that an easement is intended.  (CBS Mem. Supp. Response and

Cross, at 16 (citing Evans v. Taraszkiewicz, 125 A.D.2d 884, 885 (N.Y. App. Div. 1986)).  Aside

from its non binding nature, however, that case considered those words as only one of several

factors in the analysis.  The Evans court also based its determination on the fact that the grant, in

that case, was not temporary in nature nor did the grantors purport to retain "any" rights of

revocation.  Id. at 885-86.  Such circumstances do not exist in this case since the MLA, by its

express terms (1) expires in 2025, thus making it temporary in nature; (2) expressly provides for

revocation of the agreement under certain circumstances; (3) indicates that Conrail may

unilaterally require removal of any sign erected by CBS; and (4) is subject to any and all sales of

the Conrail property.  (PRPA Mem. Supp. Mot. S.J., Ex. F §§ 12.02, 16.02, 17.01, 23.01.)  The

MLA evidences no clear, present intention to convey an interest in real property.  To accept

CBS's argument that the mere use of the word "grant" converts the MLA into an easement

would, as PRPA and Conrail point out, effectively create an easement on behalf of CBS that

encumbers all of Conrail's property.  A reading of the contract as a whole belies any such

interpretation.

        CBS also errs in its argument that Conrail's inability to unilaterally revoke the

entire contract evidences an easement.  While CBS is correct that Conrail may revoke the MLA

in its entirety only in the event of insolvency, bankruptcy, cessation of business or default of the

other party, (PRPA Mem. Supp. Mot. S.J., Ex. F §§ 11.02-11.04), the MLA provides that

Conrail, subject to the remedies provisions, can sell or otherwise dispose of any Conrail property

which is subject to either an Existing License or Subsequent License.  (Id. §§ 2.05, 17.01.)

Likewise, sections 12.01 and 12.02 of the MLA permit Conrail to unilaterally require the

removal of any sign, subject to the remedies set forth in the remainder of the contract.  (Id. §§

12.01, 12.02.)  Given these provisions, together with the fact that the contract expires in 2025,

CBS cannot reasonably claim to have relied upon unsupported belief that it would be permitted

perpetual use of the billboards.  See Thompson v. Commonwealth, Dept. of Highways, 257 A.2d

639, 643 (Pa. Super. Ct. 1969) (where licensee, a drilling company, admitted that licensor, owner

of property containing gas well, could have plugged gas well and terminated drilling company's

privilege of taking gas at any time, licensee had no right to the gas, but merely a license

revocable at any time).

       As to CBS's claim that the MLA is assignable and, thus, runs with the land

consistent with an estoppel, the argument is also misplaced.  Section 16.01 of the MLA states, in

pertinent part:

> This Agreement shall be binding upon the successors and
> permitted assigns of the parties.  Either party may freely assign this
> Agreement in its entirety to a wholly owned subsidiary or
> controlled affiliate, or in connection with a merger, consolidation,
> corporate reorganization, or a transfer of all or substantially all of
> its assets in a single transaction, and, in each case, the assignee
> agrees in writing to be bound by the terms of this Agreement.  This
> Agreement and the Licenses may not be otherwise assigned by
> either party without the prior written approval of the other, which
> approval shall not be unreasonably withheld.

(PRPA Mem. Supp. Mot. S.J., Ex. F § 16.01.)  Nothing in this provision suggests that the MLA

runs with the land; in fact, it requires prior written approval of the other party before any

assignment can occur.  Moreover, to adopt CBS's interpretation and construe the license as

14

running with the land would effectively nullify the importance of section 2.05 of the MLA, which provides for the situation where Conrail sells property and the subsequent owner does not agree to be bound by the license.  See Ardrey Ins. Agency, Inc. v. Ins. Co. of Decatur, 656 A.2d 936, 939 (Pa. Super. Ct. 1995) (recognizing a cardinal principle of contract construction to give effect to all provisions in a contract).  Finally, the document was not recorded, suggesting an absence of intent that it run with the land.[4]  See Finley v. Glenn, 154 A. 299, 201-02 (Pa. 1931) (noting that the test of whether an equitable easement exists on land looks, in part, at record of deed).

Lastly, the Court accords no weight to CBS's argument that it has detrimentally relied on the representations of Conrail.  CBS argues specifically that once Conrail accepted money paid by CBS to acquire its rights under the MLA, the MLA became an easement by estoppel.  (CBS Sur-reply 3.)  This contention contravenes a fundamental principle of Pennsylvania law that "[a] license is not converted into a contract giving irrevocable interests in land, by the mere fact that a consideration was agreed to be paid for it."  Huff v. McCauley, 53 Pa. 206, 1866 WL 6312, at *1 (Pa. 1866).  To the extent CBS claims its expenditures for the erection and/or maintenance of the five existing signs on the Savage Yard creates detrimental reliance, CBS is again mistaken on several grounds.  First, where the costs incurred are entirely consistent with a "permissive, temporary use" set forth in a contract, no detrimental reliance occurs.  Louis W. Epstein Family P'ship., 13 F.3d at 774-75.  CBS has produced no evidence that it would have done anything differently if it had understood its license to be only temporary and permissive.  Second, if Conrail should request removal of any of the Five Billboards – an event

---

4.   CBS argues that the law is clear that "[n]ot all easements need be written and recorded to be effective."  (CBS Sur-reply Brief on Motion and Reply on Cross Motion 7 (quoting Kapp, 350 F. Supp. 2d at 609).)  While this proposition is true, the fact that a license is written, yet unrecorded is evidence that an easement was not intended.

which has not occurred – CBS has express contractual remedies, thereby negating the necessity

of equitable relief.  See Maritrans, 602 A.2d at 1286 (holding that equitable relief will lie only

where there is no equitable remedy at law).  Finally, even in the event of a breach by Conrail,

which is not expressly provided for in the contract terms, these latter expenditures would be

recoverable as "reliance damages" under contract law, not on any equitable theory.  Drysdale v.

Woerth, 153 F. Supp. 2d 678, 683 (E.D. Pa. 2001) (distinguishing between reliance damages

under contract law and unjust enrichment damages under equity).

       In sum, the Court finds no basis to resort to the equitable principles of easement

by estoppel.  The parties' agreement with respect to the Five Billboards, including the length of

the arrangement and the parties' rights with regard to the termination of the agreement, was fully

set forth in the MLA.  The Court sees no need to depart from the terms of this written document

for purposes of further defining the parties' rights.

> **B.**    **Whether the Quitclaim Deed from Conrail to PRPA Adequately Maintains and Protects CBS's Rights Under the MLA**

       In an alternative argument, CBS argues that, it is entitled to damages since the

Quitclaim Deed from Conrail to PRPA does not adequately maintain and protect its contractual

rights.  More specifically, CBS claims that (1) the Quitclaim Deed does not maintain its rights

with respect to the "Existing Licenses" for the Five Billboards and (2) the Quitclaim Deed fails

to preserve any future sign rights, as set out in the MLA.[5]  The Court addresses each argument

individually.

**1.      The Five Existing Signs**

The first point of contention is whether CBS's rights in the Five Billboards

currently existing on the Savage Yard Property have been inadequately protected by the

Quitclaim Deed, such that CBS is entitled to damages.  As noted above, section 2.06 of the MLA

provides that "in no event shall [CBS] be entitled to the remedies set forth in Section 2.05 in the

event that the sale, transfer, swap, abandonment or disposal of any Conrail Property by

CONRAIL is made subject to the applicable License, and the acquirer of any such Conrail

Property agrees to be bound by the terms of this Agreement with respect to the applicable

license." (PRPA Mem. Supp. Mot. S.J., Ex. F § 2.02.)  In an effort to accommodate that

provision, the June 21, 2007, Quitclaim Deed Transferring the Savage Yard from Conrail to

PRPA contained the following easement ("the "Easement"), reserved by Conrail and relating to

the Five Billboards:

> EXCEPTING AND RESERVING, thereout and therefrom and
> unto the said CONRAIL, permanent, perpetual, exclusive and
> assignable easements and rights to the five (5) existing signboards
> and their appurtenances located on the Premises . . . together with
> the necessary easements and rights for any necessary electric
> service lines and their appurtenances needed for illuminating said
> signboards; and together with rights and easements to reconstruct,

---

5.    CBS also argues that the Quitclaim Deed contains conflicting covenants.  One covenant states that it reserves an easement for the five Existing Signs.  (PRPA Mem. Supp. Mot. S.J., Ex. C, at 2.)  The other covenant makes PRPA's title subject to "any easements or agreements or agreements of record otherwise affecting the Premises."  (Id. at 3.)  Thus, CBS claims that the first covenant recognizes (but modifies) CBS's rights to the five Existing Signs, while the other conveys the Savage Yard subject to all existing easements, *i.e.* the MLA.  (CBS Mem. Supp. Response and Cross, at 24-25.)

This argument is based on the notion, rejected by this Court as erroneous, that the MLA is an easement.  Construing the MLA as simply a revocable license nullifies this argument.

use, maintain, modify (but not enlarge), repair, renew, replace, rehabilitate and remove said signboards all with reasonable notice to PRPA to the extent the giving of such notice is reasonably practicable under the circumstances and except in the event of such an emergency (provided that notice of such activity be given to PRPA as soon as feasible after any such activity that, by reason of an emergency, occurred without reasonable advance notice); and together with the right of reasonable ingress and egress on, over, across and through the Premises for the purposes aforesaid; and together with the exclusive right to sell, lease and assign such rights and to retain any and all revenues, income, charges, payments, considerations, compensation, rent and fees derived there from; and further together with the right of Conrail or PRPA to move and relocate the electric service easements contained in this Section, subject to the consent, not to be unreasonably withheld, of the other party to this Deed or  the successor in interests of and other party.

(Id. Ex. C at 2.)  According to the plain terms of this Easement, PRPA did not acquire any rights to or ownership interest in the Five Billboards, leaving them entirely in the possession of Conrail.

(Id. Ex. B ¶ 15.)  As Conrail, in turn, is subject to the terms of the MLA, the logical conclusion suggests that CBS's rights in the Five Billboards have been fully preserved.

CBS, however, now contends that the Easement modifies and decreases CBS's rights to the existing signs in five respects.  As a whole, however, this argument relies on the mistaken presumption that the MLA creates an easement, as opposed to a revocable license.  Moreover, each of the five alleged deficiencies turns on little more than semantics.  First, CBS claims that the Quitclaim Deed contains a restrictive covenant, which runs with the land, limiting the use of the Savage Yard to "Port Facility Purposes" and "Port Related Purposes," neither of which is defined to include commercial advertising signs that advertise products or services not used "to directly support or facilitate the operation or activities of a Port Terminal or Port Facility."  (Id. Ex. C, at 3-4.)  According to CBS, this use restriction, if enforced, would prevent

18

CBS from using and/or re-sublicensing the Existing Signs (as well as future signs) for advertising anything other than port operations or port-related activities.

The Court finds no merit to this argument.  "Restrictions on the use of land are not favored by the law because they are an interference with an owner's free and full enjoyment of his property. . . . Therefore, they are to be strictly construed." Burns v. Baumgardner, 449 A.2d 590, 592-93 (Pa. Super. Ct. 1982) (internal citations omitted).  Moreover, "[i]t is generally true that easements may not be modified, changed, altered, or relocated without the consent of both the dominant and servient estates." Soderberg v. Weisel, 687 A.2d 839, 842 (Pa. Super. Ct. 1997).  Strictly construing the restrictive covenant in this regard, it does not purport to limit any of Conrail's retained property rights under the easement.  Indeed, a plain reading of the language of the Quitclaim Deed undermines the interpretation set forth by CBS.  See Louis W. Epstein Family P'ship, 13 F.3d at 766 (holding that in the case of express easements, the terms of the conveyance and language of the agreement, unless ambiguous, determine the rights and liabilities of the parties).  The Deed defines the "Premises" as the 12.22 Acres of Land commonly known as the Savage Yard, "excepting and reserving thereout and therefrom" the easement to Conrail for the Five Billboards.  (PRPA Mem. Supp. Mot. S.J., Ex. C, at 1-2.)  Thereafter, the Quitclaim Deed subjects only the "Premises" to the restrictive covenant on use.  (Id. at 3.)  As the "Premises" does not include the Easement to Conrail for the Five Billboards, the restrictive covenant does not apply to the Easement.  In fact, to date, CBS has used the Five Billboards for commercial purposes without interference from PRPA.  (Id. Ex B, ¶ 15.)

Second, CBS contends that the Quitclaim Deed limits reconstruction of the Five Billboards to their present size by stating that Conrail has an easement to the five existing

signboards, together with the necessary easements "to reconstruct, use, maintain, modify *(but not enlarge)*, repair, renew, replace, rehabilitate and remove said signboards."  (Id. Ex. C at 2 (emphasis added).)  The MLA, according to CBS, imposes no such restriction on replacement signs.

Again, however, CBS's argument is misplaced.  As noted above, the MLA defines an "Existing Sign" as a sign for which a license has been issued on an "Existing Site" on Conrail property prior to January 1, 2003.  (Id. Ex. F, § 1.10.)  An "Existing Site" is *"the real property located directly below, and the air space occupied by, an Existing Sign* or subject to an Existing License and the real property occupied by any poles beams or footings of such Existing Sign, or in the case of a Bridge Sign, the railroad bridge trestle."  (Id. § 1.11) (emphasis added).  Accordingly, by its own terms, the MLA strictly defines the size of an Existing Sign.  To the extent CBS would purport to expand the size of an Existing Sign, it would have to apply for a "New License" for a "New Sign," defined as a "New Billboard or a New Bridge Sign for which a license is issued after January 1, 2003."  (Id. § 1.17.)  Nothing in the MLA permits CBS to convert the Existing Signs into larger billboards while maintaining their status as "Existing Signs."[6]

Third, CBS contends that "[t]he Easement in the Quitclaim Deed refers to the 'purpose' of the Existing Signs without defining that the purpose is commercial advertising." (CBS Mem. Supp. Response and Cross, at 26.)  This argument is both enigmatic and without

---

6.   Further support for this interpretation is found in Section 2.05 of the MLA, which states that in the event Conrail sells any property subject to an Existing License or Conrail requires the removal of an Existing Sign pursuant to section 12.02 of the MLA, Conrail could either pay a calculated amount of reimbursement to CBS or "[s]ubstitute a different site which is mutually agreeable to both parties *of similar size* and general revenue characteristics."  (Id. § 2.05(a)(iii)(A).)

foundation.  The purposes of the Easement referred to in the Quitclaim Deed include all ingress

and egress needed for the illumination, reconstruction, use, maintenance, modification, repair,

renewal, replacement, rehabilitation and removal of the Five Billboards.  (PRPA Mem. Supp.

Mot. S.J., Ex. C, at 2.)  As noted by PRPA, the Easement is given not to CBS, but to Conrail,

who is then bound to use the Easement in accordance with the terms of the MLA.

        Fourth, CBS argues that "the Quitclaim Deed covenant providing for when

Conrail's sign easement can be moved to other parts of the Savage Yard (as opposed to moving

individual signs for railroad operations purposes), differs materially from its counterpart in the

MLA, particularly by not permitting CBS to relocate its signs."  (CBS Mem. Supp. Response and

Cross, at 26-27.)  Again, however, this is a distinction without a difference.  The MLA states that

Conrail reserves the right to require the removal of any signs for any and no reason.  (PRPA

Mem. Supp. Mot. S.J., Ex. F § 12.02.)  In such an event, Conrail could either substitute a

different site which is mutually agreeable to both parties or pay CBS a calculated reimbursement

amount.  (Id. § 2.05.)  The Quitclaim Deed, on the other hand, states that Conrail's easement is

subject to:

> PRPA's right to move the easements reserved in this Deed, upon
> PRPA's receipt of consent, not to be unreasonably withheld, of the
> holder of the easement.  PRPA shall pay for the movement of the
> easement, plus the cost of moving the improvements thereon and
> the cost of other configurations necessitated by the movement of
> any said easements.  The movement of said easements shall not
> unreasonably interfere or complicate railroad operations or reduce
> railroad capacity.

(Id. Ex C at 3.)  In either case, CBS has no guaranteed right of maintaining the Five Billboards in their precise location.  Moreover, under either agreement CBS would incur no cost for the movement of a sign and would obtain a new sign location.

Finally, CBS argues, with no further explanation, that "[t]he defined easement area for signs is less than the entire Savage Yard."  (CBS Mem. Supp. Response and Cross, at 27.)  The Easement in the Quitclaim Deed, however, covers all existing billboards on the property, thus fully protecting CBS's rights.  At no point did CBS have an unfettered right to maintain signs in any other portion of the Savage Yard.

Accordingly, the Court finds no basis for CBS's arguments that the Quitclaim Deed modifies its rights to existing signs.  Although the Easement differs from the MLA in some semantic respects, there is no material distinction between CBS's rights to the Five Billboards under the two documents.

### 2.    CBS's Rights to Future Signs

In the second portion of its argument, CBS contends that the Quitclaim Deed between Conrail and PRPA attempts to protect only CBS's rights to maintain the Existing Sites for the Five Billboards, but does not address CBS's rights to future signs on New Sites.  Specifically, CBS claims that its alleged easement, allowing it to erect new signs on Conrail property, has been effectively extinguished by the Quitclaim Deed conveying the Savage Yard to PRPA.

Again, however, CBS rests its argument on the erroneous assumption that the MLA grants it an easement.  As the Court has deemed the MLA to be simply a revocable, contractual license, we turn to the strict contractual language to determine the scope of CBS's

rights in the event of a sale of Conrail property.  Per the Agreement, CBS paid to Conrail $15 million dollars for the exclusive right to license New Sites for New Signs for advertising purposes on any Conrail property.  (PRPA Mem. Supp. Mot. S.J., Ex. F §§ 2.04, 3.01.)  In order to erect a New Sign on a New Site, CBS has to submit an application for a proposed new sign, which Conrail reviews and either accepts or rejects.  (Id § 4.02.)  Conrail cannot unreasonably withhold approval of these applications.  (Id. § 4.02(b).)

As noted above, the MLA expressly sets forth the remedies available to CBS in the case that Conrail sells or otherwise disposes of its property.  Subsection (a) of section 2.05 deals with property then subject to an Existing License or Subsequent License.  (Id. § 2.05(a).) Subsection (b) deals with property then subject to a New License.  (Id. § 2.05(b).)  Subsection (d) deals with property that is not subject to any License:[7]

> In the event that CONRAIL sells, transfers, swaps, abandons or
> otherwise disposes of any material portion (measured, in the
> aggregate, as three per cent (3%) of the then current corridor
> mileage taking into account all additions thereto and subtractions
> therefrom during the Term hereof) of the CONRAIL Property
> which is not then subject to an Existing License, Subsequent
> License or New License, the New Sign Fee Performance Standard,
> for (only) the period in which the CONRAIL Property was sold,
> transferred, swapped, abandoned or disposed shall be reduced by
> an amount equal to such percentage.

(Id. § 2.05(d).)  Giving plain effect to this contractual language, and in light of the presence of remedies for all other cases in which Conrail disposes of part of its land, there is an obvious negative implication that if Conrail sells or otherwise disposes of less than three percent of its

---

7.   Notably, subsection (c) is inapplicable to the dispute at issue.

property not then subject to an Existing License, Subsequent License or New License, the parties did not intend for CBS to obtain any refund of its New Sign Fee Performance Standard.

   This reading finds further support in Section 17.01 of the MLA, wherein the parties expressly agreed that "*Except as otherwise agreed herein or otherwise in writing*, this Agreement is expressly made subject to any abandonment by CONRAIL of all or any part of its lines of railroad, to any and all sales of the CONRAIL Property, and to any existing and future encumbrances on or impediments in the title to the CONRAIL Property."  (PRPA Mem. Supp. Mot. S.J., Ex. F § 17.01 (emphasis added).)  "Under Pennsylvania law, parties may enter into an agreement that provides for an exclusive remedy in the event of non-performance or breach." Mitsubishi Corp. v. Goldmark Plastic Compounds, Inc. 446 F. Supp. 2d 378, 384-85 (W.D. Pa. 2006); Royal Indem. Co. v. § Guards, Inc., 255 F. Supp. 2d 497, 502 (E.D. Pa. 2003) (unlike exculpatory clauses that are disfavored and subject to strict construction, limitation of liability clauses are not disfavored and are construed pursuant to the general rules applicable to contract interpretation).  Where the parties seek to allocate commercial risks among themselves through such a clause, an exclusive remedy provision operates exactly as it is intended and does not fail of its essential purpose.  Mitsubishi Corp., 446 F. Supp. 2d at 385.  Given such well-established jurisprudence, the Court finds that Conrail was free to sell its property subject only to the remedies provisions set forth in the MLA.

   Notably, in its responsive pleadings, CBS does not even mention section 2.05(d), let alone argue that the Savage Yard exceeded three percent of Conrail's property holdings, such that this provision would operate to provide a remedy.  Nor does CBS dispute that the MLA permits Conrail to sell its property subject only to the remedies set forth in the contract.  Absent

some plausible, alternate interpretation of these contractual provisions, the Court must accept

their plain meaning and find that the parties did not intend for a remedy to apply in the event that

Conrail sold less than a "material" portion of its property that was not subject to any Existing,

Subsequent or New Licenses.[8]

### C.   Whether CBS is a "Condemnee" Entitled to Compensation Under the Eminent Domain Code

Finally, CBS contends that it maintains a cause of action for damages under the

Pennsylvania Eminent Domain Code Act, of June 22, 1964, Special Sess., P.L. 84, *as amended,*

26 P.S. §§ 1-101-1-903.[9]  Under this theory, it asserts that a condemnation occurred on

---

8.   PRPA and CBS exchange vigorous arguments as to the impact of the Philadelphia Zoning Code on CBS's future rights.  Specifically, PRPA argues that CBS could not even apply for a New Sign for the Savage Yard because the portion of the City of Philadelphia's Zoning Code ("Zoning Code") which governs the Savage Yard precludes the erection of new signs.  First, it claims that section 14-1604(3) of the Zoning Code includes a spacing requirement, whereby billboards may not be located within 500 feet of any other outdoor billboard.  Second, section 14-1604(7) of the Zoning Code indicates that no more than two sign spaces or one sign support structure are permitted on any lot.  Third, Zoning Code section 14-1604(10) states that, for every new billboard erected, a billboard of equal or greater sign area must be removed elsewhere in the City.  Citing to section 7.02 of the MLA, which nullifies the agreement in the event of prohibitive governmental requirements, PRPA thus argues that any claim by CBS to future prospecting rights at the Savage Yard is moot.  (PRPA Mem. Supp. Mot. S.J., Ex. F § 7.02).

   Although CBS offers multiple arguments in response, the Court finds convincing its contention that the Zoning Code could change in the foreseeable future, prior to the 2025 expiration of the MLA, such that additional signs would be permitted on the Savage Yard property.  Indeed, as noted by CBS, a Special Commission was authorized by voters and appointed in 2007 to reform and modernize the Zoning Code.  (CBS Mem. Supp. Response and Cross, Ex. 10.)  Although PRPA argues that changes in the Zoning Code are speculative, the mere possibility of change, particularly one occurring prior to 2025, operates to undermine any argument by the PRPA that the Zoning Code nullifies CBS's future sign rights at the Savage Yard.

9.   PRPA and CBS dispute whether this case is governed by Pennsylvania substantive law or federal substantive law.  Federal Rule of Civil Procedure 71.1 definitively answers this question.  Rule 71.1(k) states that "[t]his rule governs an action involving eminent domain under state law. But if state law provides for trying an issue by jury--or for trying the issue of compensation by jury or commission or both--that law governs."  FED R. CIV. P. 71.1(k).  As explained,

   [A] few cases involving the exercise of the power of eminent domain under the law of a state reach the district courts under their diversity-of-citizenship jurisdiction. . . . These cases are governed by the federal procedure, . . . but state laws affecting substantive rights must, of course, be given effect. . . . In general, then, when condemnation proceedings are had in federal court that involve the exercise of the power of eminent domain under the law of a state, the procedural provisions of [the Federal Rules] apply but the substantive law is that of the

(continued...)

November 22, 2004, when PRPA filed a Declaration of Taking in the Philadelphia Court of

Common Pleas and with the Recorder of Fees.  (PRPA Mem. Supp. Mot. S.J., Ex. B ¶ 9.)  As

title vested in PRPA at the time of the Declaration of Taking and as CBS was granted permission

to intervene in the condemnation following a hearing on April 6, 2005, it is a "condemnee" under

26 P.S. §§ 1-201(2) and 1-506(a) of the Eminent Domain Code.  In turn, CBS claims that PRPA

is liable to it for just compensation, reasonable attorney fees and other costs incurred because of

the condemnation proceedings.

This argument again fails.  Section 507 of the Eminent Domain Code,[10] provides,

in relevant part, as follows:

> (a) *The claims of all the owners of the condemned property*,
> including joint tenants, tenants in common, life tenants,
> remaindermen, owners of easements, or ground rents, *and all
> others having an interest in the property*, and the claims of all
> tenants, if any, of the property, *shall be heard or tried together* and
> the award of the viewers or the verdict on appeal from the viewers
> shall first fix the total amount of damages for the property, and

---

9.  (...continued)

state. The state procedure as to the assessment of compensation must be
followed . . . .

12 Wright, Miller & Cooper, Federal Practice and Procedure § 3055 (1973).

This case is presently based on diversity jurisdiction.  PRPA filed two complaints in state court
condemning the Savage Yard pursuant to the Pennsylvania Eminent Domain Code.  Although the case was
removed to federal court on Conrail's allegation that the Surface Transportation Board ("STB") had exclusive jurisdiction,
this Court subsequently eschewed that theory of jurisdiction, thereby retaining the matter based on diversity
jurisdiction.  (CBS Mem. Supp. Response and Cross, Exs. 1,14,15.)  Moreover, Count I of PRPA's Amended
Complaint in this Court expressly alleges a claim under the Pennsylvania Eminent Domain Code.  Accordingly,
Pennsylvania law governs the parties substantive rights in this case.  See Allegheny County v. Frank Mashuda Co.,
360 U.S. 185, 194, 79 S. Ct. 1060, 1066 (1959) (noting that it is settled practice for federal district courts to decide
state condemnation proceedings and apply state eminent domain law).

10.    The Eminent Domain Code was repealed prospectively on May 4, 2006 by P.L. 112, No. 34 § 5(2).  As this
case was initiated prior to that time, however, the prior incarnation of the Eminent Domain Code governs the parties'
dispute.  Accordingly, the Court will reference the relevant portions in effect at the time of the Declaration of
Taking.

> second, apportion the total amount of damages between or among
> the several claimants entitled thereto.

26 P.S. § 1-507 (emphasis added).  Pursuant to this section, the Board of Viewers determines

both the amount of the condemnation award and how it is apportioned among the parties to the

condemnation.  In re Condemnation by the DOT, 871 A.2d 896, 900 (Pa. Commw. Ct. 2005).  In

light of the inherent conflict of interest between the parties with an interest of the property, courts

will often defer to contractual condemnation clauses, negotiated by parties with an interest in the

property, to determine which person should be paid by the condemnor, even when the condemnor

is not itself a party to the contract.  Id. at 901.

   In In re Condemnation by the DOT, the Pennsylvania Commonwealth Court faced

the issue of whether not only the courts, but a condemnor itself could rely on a condemnation

clause in a contract between the condemnees to determine how the condemnation award for

taking the property was to be divided.  Id.  The contract – in that case a lease and franchise

agreement – provided that "[a]ll sums payable by a condemning authority for a taking of any

portion of the Marketing Premises . . . will be paid to [lessor] and [lessee] has no interest

whatsoever in those sums; except that [lessee] may receive any sum payable . . . for loss of

goodwill."  Id. at 902.  The trial court permitted the condemnor to use the contract as a way to

avoid payment of just condemnation to the lessee.  Id. at 899.  On objection by the lessee, the

Pennsylvania Commonwealth Court held that the condemnor appropriately used the lease to

determine how the condemnation award for the taking of the property was to be divided.  Id. at

902.  The condemnor "did not need to be a party to the Lease in order for the terms of the Lease

to be used as evidence establishing [lessee's] interest in condemnation damages.  Indeed, there is

no other way to establish the rights of a tenant in property subject to condemnation." Id.

(footnote omitted); see also In re Commonwealth, Dept. of Transp., 447 A.2d 342, 344 (Pa.

Commw. Ct. 1982) (noting that it was proper for condemnor to rely on contractual lease between

two condemnees to determine allocation of damages under Eminent Domain Act).

      In the case at bar, as repeatedly indicated above, CBS derived its rights on the

Savage Yard property directly from the MLA. Accordingly, the Court turns first and foremost to

the language of that contract. Section 13.01 of the MLA states:

> [I]n the event that an Existing Site or New Site should be
> condemned during the Term of the Agreement, it is agreed that
> CONRAIL shall receive any and all awards payable as a result of
> the condemnation of the property, however, [CBS] shall be entitled
> to any award or portion thereof applicable to any Sign or Signs
> located thereon and for the loss of revenues derived therefrom.
> CONRAIL shall provide [CBS] with written notice of any
> proposed taking and shall not preclude [CBS's] participation in the
> condemnation process.

(PRPA Mem. Supp. Mot. S.J., Ex. F § 13.01.) Such unambiguous language indicates that

although CBS may participate in any condemnation process, it is only entitled to damages should

it lose any revenue as a result of interference with its Five Billboards.[11] As the Court has already

found, CBS's rights to maintain the Five Billboards at the Savage Yard were fully preserved.

Moreover, CBS was never required to remove, modify or relocate any of the Five Billboards at

any time during the course of the condemnation proceedings. See Hindsley v. Lower Merion

Twp., 360 A.2d 297, 298-99 (Pa. Commw. Ct. 1976) (finding no taking under the Eminent

---

11. Section 13.01 also refers to the condemnation of "New Sites" which are locations anywhere on Conrail property not covered by an existing license or subsequent license. This section, however, only entitles CBS to damages for "any award or portion thereof applicable to any Sign or Signs located thereon and for the loss of revenues derived therefrom." Id. § 13.01. As PRPA had only the Five Billboards on the Savage Yard at the time the condemnation proceedings were commenced, it was entitled to damages only to the extent it experienced loss of revenues derived from those signs.

Domain Code where tenants were allowed to remain on leased premises, which had been condemned and subsequently sold to condemning authority in a private negotiation and sale, until expiration of lease).  Under the principles set forth in <u>In re Condemnation by the DOT</u>, 871 A.2d at 902, PRPA was thus entitled to conclude that CBS had no entitlement to damages.[12]

       To avoid the import of this provision, CBS first attempts to distinguish <u>In re Condemnation by the DOT</u>, arguing that the contract's condemnation clause in that case, unlike the MLA, provided that the third party franchise dealer was entitled to no condemnation damages and was not entitled to participate in any condemnation proceedings.  (CBS Mem. Supp. Response and Cross, at 22.)  This factual distinction, however, does not detract from the fundamental legal principle that a condemnor, who is not a party to the contract, is entitled to rely on such a contractual provision to determine the allocation of condemnation damages.  While the MLA created an entitlement in CBS to certain specified condemnation damages, those damages were never incurred and, thus, are not due to CBS.

       Second, CBS contends that, under Pennsylvania law, its rights are not derivative to those of Conrail and, thus, are not limited by Conrail's settlement. While this proposition is correct under Pennsylvania law, CBS fails to note that its rights on the Savage Yard are governed entirely by the contract which creates them.  By virtue of its execution of the MLA, CBS agreed to limit its entitlement to condemnation damages.  It now remains bound by that provision.

---

12.   PRPA also argues that no "taking" under the Eminent Domain Code ever occurred since a Quitclaim Deed in Lieu of Condemnation was filed and, thus, no effective Pennsylvania condemnation took place.  CBS, on the other hand, claims that the Savage Yard passed to PRPA at the moment of filing state condemnation proceedings in November 2004, thereby making it a condemnee entitled to general condemnation damages.  As the MLA effectively defines any entitlement by CBS to condemnation damages, the Court need not address this argument.

Third, CBS argues that the Quitclaim Deed between Conrail and PRPA was invalid, did not protect any of CBS's rights and, thus, did not preclude damages under § 13.01 of the MLA. Under this theory, CBS contends that, pursuant to the Pennsylvania Eminent Domain Code, title vested in PRPA at the time of the Declaration of Taking. See 26 P.S. § 1-402(a) ("[c]ondemnation . . . shall be effected only by the filing in court of a declaration of taking . . . and thereupon the title which the condemnor acquires in the property condemned shall pass to the condemnor on the date of such filing . . ."). Accordingly, Conrail's legal title to the Savage Yard and CBS's license were extinguished by the fee simple taking on November 22, 2004. No relinquishment has been filed with the District Court and nothing has been submitted to the Court or Recorder of Deeds to revest title in Conrail. In turn, as Conrail did not have legal title to the Savage Yard as of June 21, 2007, the date of the Quitclaim Deed, it could not have conveyed interest in the land or retained an easement in the Five Billboards.

At first blush, CBS's argument causes this Court some hesitation. On closer scrutiny, however, the Court deems the problem to be merely a procedural anomaly which can be immediately remedied upon conclusion of these proceedings. As noted above, Conrail executed a Quitclaim deed on June 21, 2007, transferring the Savage Yard to PRPA and reserving an easement to Conrail for the Five Billboards. Thereafter, on July 30, 2007, PRPA and Conrail signed a Settlement Agreement and Mutual Release, wherein they expressly acknowledged that:

> the Notice of Filing of Declaration of Taking, the Notice of Condemnation, and the Declaration of Taking filed by the PRPA in the Pennsylvania Court of Common Pleas and with the Recorder of Deeds and/or Department of Records, *did not effect a final taking of the property at issue*, and the PRPA will withdraw said condemnation filings prior to the Closing date set forth in the Sales Agreement, and will take whatever actions necessary to confirm

30

> that title to the subject property has either been retained by or
> revested in Conrail.

(CBS Mem. Supp. Response and Cross, Ex. 11 (emphasis added).)  The following day, the

undersigned issued a Stipulated Order dismissing the condemnation matter with prejudice and

ordering as follows:

> To the extent that the Notice of Filing of Declaration of Taking, the
> Notice of Condemnation, and the Declaration of Taking filed by
> the Philadelphia Regional Port Authority ("PRPA") in the
> Pennsylvania Court of Common Pleas and with the Recorder of
> Deeds and/or Department of Records, on or about November 22,
> 2004, constituted a taking of the property at issue, the PRPA agrees
> to withdraw said condemnation filings, and to take whatever
> actions necessary to confirm that title to the subject property has
> either been retained by or revested in Consolidated Rail
> Corporation ("Conrail").

(Id.)  Although PRPA has yet to dismiss the condemnation action and seek to revest title in

Conrail, as of the date of the original taking, such a dismissal cannot occur without the consent of

CBS as an intervenor.  Upon conclusion of these proceedings, PRPA, by order of this Court, will

be required to withdraw the condemnation proceedings and revest title in Conrail as of the date

of the original taking, thereby granting full effect to the Quitclaim Deed.  (Id.)  To the extent that

such events do not occur, this Court retains jurisdiction to enforce the attached Settlement

Agreement and Mutual Release.  (Id.)  Any continued delay in the dismissal of the condemnation

action, the revesting of title in Conrail and the full effectiveness of the Quitclaim Deed results

solely from CBS's continued dispute of the settlement.[13]   Accordingly, the Court rejects this argument.

Finally, Conrail argues that it is nonetheless entitled to attorneys' fees and costs under section 1-408 of the Eminent Domain Code.  As noted above, however, section 13.01 of the MLA grants "any and all awards payable as a result of the condemnation of the property" to Conrail, but for "any award or portion thereof applicable to any Sign or Signs located thereon and for the loss of revenues derived therefrom."  This provision is neither limited to a just compensation award nor allows for an award of attorneys fees and costs.  Moreover, as repeatedly indicated above, CBS has never suffered any taking of its Five Billboards or loss of revenue therefrom, since the Five Billboards remain on the property and continue to generate revenue for CBS.  Nor was CBS ever asked to remove or make changes to these Billboards during the course of the condemnation proceedings.[14]  (PRPA Mem. Supp. Mot. S.J., Ex. B ¶ 15.)

---

13.   The Court finds disingenuous CBS's current argument that it has somehow been precluded from exercising its rights of participating in the condemnation process under section 13.01 of the MLA.  Quite to the contrary, CBS was entitled to intervene in the condemnation proceedings and has, by its intervention, delayed the resolution of these proceedings.

14.   In any event, CBS's reliance on 26 P.S. § 1-408 is misplaced.  This section provides that a condemnee is entitled to reimbursement from a condemnor for reasonable appraisal, attorney and engineering fees, and for other costs and expenses actually incurred due to the condemnation proceedings only where a declaration of relinquishment is filed within one year from the filing of the declaration of taking.  26 P.S. § 1-408.  By its express terms, section 1-408 only applies where a relinquishment is filed within one year of the declaration of taking.  See Alexander v. Snow Shoe Twp., 798 A.2d 809, 813 (Pa. Commw. Ct. 2002).

Although CBS concedes that the one year limitation period was not met in this case, it relies on the case of Alexander v. Snow Shoe Twp., 798 A.2d 809, 813 (Pa. Commw. Ct. 2002), to contend that this factor is inconsequential. In that case, appellees filed a declaration of taking in May of 1991.  Id. at 810.  No activity occurred in the matter for over two years and the appellants filed a petition for dismissal of the case and declaration of relinquishment.  Id.  On May 20, 1998, the court ordered appellees to file a declaration of relinquishment.  Id. at 810-11.  That order was never appealed and appellees actually filed the declaration of relinquishment in July of 1998.  Id. at 811.  Recognizing the "highly anomalous" facts of the case, the Commonwealth Court held that, "[t]he Court will not permit a condemnor to thus ignore its responsibility as a governmental authority under Section 408 of the Code, to the palpable detriment of a condemnee, by intentionally delaying the filing of a declaration of relinquishment."  Id.

That case is inapposite to the dispute before the Court.  In this matter, PRPA did not simply file a

(continued...)

In sum, the Court finds that CBS is not entitled to any condemnation damages under the Pennsylvania Eminent Domain Code in connection with the sale of the Savage Yard to the PRPA.  Accordingly, the Court grants summary judgment in favor of PRPA and Conrail on this count.

**D.**     **Conclusion**

Notwithstanding CBS's attempts to recharacterize the current dispute as one invoking property and condemnation principles, both the parties and this Court remain bound by the explicit contractual language entered into by Conrail and CBS.  Giving plain meaning and import to such language, the Court finds that CBS's requests for a declaratory judgment and damages are meritless.  Accordingly, the Court enters judgment in favor of Conrail and against CBS.  An appropriate order follows.

---

14.  (...continued)
declaration of taking and then do nothing.  Rather, after the filing of the initial Declaration of Taking, the parties diligently worked towards a settlement, ultimately agreeing to a Quitclaim Deed in lieu of condemnation.  At no point did any Court deem the taking invalid.  Moreover, in order to revest title in Conrail, the parties need not file a declaration of relinquishment – a prerequisite to receiving attorneys' fees and costs under section 408.  Rather they may simply effect a revesting of title in Conrail via a properly recorded agreement.  See 26 P.S. § 408(e).  In light of the factual distinctions between this case and the Alexander case, the Court declines to find that Section 408 would apply here.  See Alexander, 798 A.2d at 814 (acknowledging that "the facts in this case are highly anomalous and our decision herein will likely have a very limited application.").

Assuming *arguendo* that CBS would be entitled to attorneys' fees, it would have to rely on Section 610, which states, "[t]he owner of any right, title, or interest in real property acquired or injured by an acquiring agency, who is not eligible for reimbursement of such fees under sections 406(e), 408 or 609 of this act, shall be reimbursed in an amount not to exceed five hundred dollars ($500) as a payment toward reasonable expenses actually incurred for appraisal, attorney and engineering fees."  26 P.S. § 1-610 (footnote omitted).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PHILADELPHIA REGIONAL PORT AUTHORITY, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| APPROXIMATELY 1.22 ACRES OF LAND | : | |
| (IDENTIFIED AS SAVAGE YARD) IN | : | |
| PHILADELPHIA, PENNSYLVANIA | : | NO.  04-5930 |
| and CONSOLIDATED RAIL CORPORATION | : | |
| and CBS OUTDOOR GROUP, INC. and CBS | : | |
| OUTDOOR, INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| PHILADELPHIA REGIONAL PORT | : | |
| AUTHORITY and CONSOLIDATED RAIL | : | |
| CORPORATION, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CBS OUTDOOR GROUP, INC. and CBS | : | |
| OUTDOOR, INC., | : | |
| | : | |
| Defendants. | : | |

**<u>ORDER</u>**

AND NOW, this *2nd* day of *April*, 2008, upon consideration of Philadelphia

Regional Port Authority's ("PRPA's") Motion for Summary Judgment (Doc. No. 36),

Consolidated Rail Corporation's ("Conrail's") Joinder therein (Doc. No. 38), CBS Outdoor

Group, Inc. and CBS Outdoor, Inc.'s ("CBS's") Response to PRPA's Motion for Summary

Judgment and Cross-Motion for Summary Judgment (Doc. No. 40), PRPA's Response to CBS's

Cross-Motion for Summary Judgment and Reply to CBS's Response to PRPA's Motion for Summary Judgment (Doc. No. 41), Conrail's Memorandum in Further Support of its Joinder in the PRPA's Motion for Summary Judgment and in Opposition to CBS Outdoor's Cross-Motion for Summary Judgment (Doc. No. 42), and CBS's Sur-Reply Brief to PRPA's and Conrail's Memoranda in Further Support of Motions for Summary Judgment and in Opposition to CBS's Cross-Motion for Summary Judgment and Reply in Support of CBS's Cross-Motion for Summary Judgment (Doc. No. 43), it is hereby **ORDERED** as follows:

1.      The Motion of PRPA and Conrail for Summary Judgment is **GRANTED**. Accordingly, this Court hereby **DECLARES** that:

   (a)      Any and all rights of CBS with respect to the five billboards (two of which have supporting structures on the property and three of which overhang the property) on the property known as the "Savage Yard," containing approximately 12.22 acres adjacent to the Walt Whitman Bridge in Philadelphia, Pennsylvania, have not been affected by any Condemnation and/or Quitclaim Deed in Lieu of Condemnation executed between PRPA and Conrail; and

   (b)      CBS is entitled to no compensation from PRPA or Conrail as a result of the transfer of the Savage Yard from Conrail to PRPA;

2.      CBS's Motion for Summary Judgment is **DENIED**;

3.      **JUDGMENT is ENTERED** in favor of PRPA and Conrail, and against CBS.  This case is marked **CLOSED**.

BY THE COURT:


 *s/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.